# HUTCHINSON COAL CO. et al. v. MILLER.
## No. 971.

District Court, N. D. West Virginia.
Sept. 2, 1937.

receiver" or "said receiver"; and the National Bank of Fairmont as "the bank" or "said bank."

I. The plaintiff Hutchinson Coal Company is, and during all the period of time covered in this stipulation was, a corporation duly organized and existing under and by virtue of the laws of the state of West Virginia, having its principal office and principal place of business in the city of Fairmont, in the Northern District of said state; and the plaintiff Melville L. Hutchinson resides, and during most of his lifetime has resided, in the city of Fairmont, in the Northern District of the state of West Virginia.

The defendant, Robert C. Miller, receiver of The National Bank of Fairmont, which is a corporation chartered and organized under the laws of the United States of America, and now in liquidation, is a resident and inhabitant of the city of Fairmont, in the Northern District of West Virginia; and the said the National Bank of Fairmont, during its corporate existence and activities, was engaged in business, and its principal office and place of business was located in the city of Fairmont, in the Northern District of the state of West Virginia.

II. That, under and by the order of the President of the United States of America of March 6, A. D. 1933, declaring a bank holiday, the National Bank of Fairmont was closed, and at the expiration of the holiday declared by the President it was not permitted to reopen and resume business, and on March 16, A. D. 1933, the Comptroller of the Currency, with the concurrence of the Secretary of the Treasury of the United States, appointed James H. Thomas as conservator of said bank, on which date the conservator qualified as such and took possession and custody of all of the books, records, and assets of said bank of every nature and description whatsoever, including the claims, credits, funds, and assets involved in this suit, and continued to hold such possession and custody until the termination of the conservatorship, which was terminated by the appointment of a receiver, as in the following paragraph set forth.

III. That, on November 13, A. D. 1933, the Comptroller of the Currency, with the concurrence of the Secretary of the Treasury of the United States, appointed Robert C. Miller receiver of said bank, who qualified as such re-

Melvin G. Sperry and Clifford R. Snider, both of Clarksburg, W. Va., for plaintiffs.

Harry E. Watkins, of Clarksburg, W. Va., for defendant.

BAKER, District Judge.

*Definitions and Designations:* For brevity and conciseness, the plaintiff Hutchinson Coal Company will hereafter frequently be referred to and designated "the coal company" or "said coal company"; the plaintiff Melville L. Hutchinson, who commonly signs his name by the use of his initials "M. L." Hutchinson, will frequently be designated "Hutchinson" or "said Hutchinson"; the defendant, Robert C. Miller, receiver of the National Bank of Fairmont, a corporation, in liquidation, will be designated and referred to as "the

720

ceiver on November 14, A. D. 1933, and took over from the conservator possession of all of the claims, credits, funds, and assets of said bank, and, since said date, has held, and still holds, possession and custody thereof, and has acted, and is now acting, as receiver of said bank.

IV. That, on March 6, A. D., 1933, the date of the closing of said bank, it was indebted to Melville L. Hutchinson, upon the balance of deposits made by him, and carried in what is commonly designated as a checking account, in the sum of $85,620.66.

The bank held notes as follows:

(a) A note of the Hutchinson Coal Company, dated January 23, 1933, payable 90 days after date, for the sum of...... $25,000.00
(Note: This note was the last renewal of an obligation for the sum of $28,950, dated October 31, 1931, which original obligation had been reduced to $25,000).

(b) A demand note made by Hutchinson Coal Company to the said Hutchinson and C. H. Jenkins (endorsed by them, and the endorsers by writing thereon having waived presentment, demand and notice) bearing date Dec. 11, 1931, for the sum of........................... 20,000.00

(c) A joint and several note of Christ Episcopal Church and said Hutchinson for the sum of............................... 16,920.00

(d) A joint and several note of Duncan Sinclair and said Hutchinson for the sum of ............................... 4,000.00

Total in notes......................... $65,920.00

Melville L. Hutchinson requested the conservator, and, in turn, the receiver, to charge the above-described notes to his account as proper offsets to the amount thereof of the obligation of the said bank to him, which transaction, if consummated, would have shown the bank to be indebted to the said Hutchinson in the net sum or amount of $19,700.66.

Therefore, the plaintiff Melville L. Hutchinson made proof of the net obligation as claimed by him, of said bank to him, for the sum of $19,700.66, and filed the same with said conservator, and, subsequently, upon his appointment, with said receiver.

V. That, during the time he was in charge of said bank, the said conservator, with the approval of the Comptroller of the Currency of the United States, charged the notes described under items (c) and (d) above against the said Hutchinson, as proper offsets of the liability of said bank to the said Hutchinson, and delivered the same unto the said Hutchinson, so that this controversy concerns and in-

volves only the two notes (a) and (b) listed in the preceding paragraph.

VI. The origin and history of the obligations represented by notes (a) and (b) follow: On October 31, 1931, the coal company, on its negotiable, promissory collateral note, payable 90 days after date for the sum of $28,950, borrowed the face amount of said note from said bank. To secure the payment of this obligation the said coal company delivered, hypothecated, and pledged to said bank six United States Treasury Bonds, each of the par value of $5,000, and bearing interest at the rate of 3⅜ per centum per annum, and bearing the numbers or symbols 6361—A, 6370—L, 6372—B, 6373—C, 6421—A, and 7467—H, of the aggregate par value of $30,000, all of said bonds being the property of Melville L. Hutchinson, and loaned by him to the Hutchinson Coal Company, to the end that it might hypothecate and pledge said bonds and borrow from said bank the sum of $28,950. At the time this note was made and delivered to said bank, it was the primary obligation of the Hutchinson Coal Company. The note of $25,000, hereinbefore described, was a renewal for the unpaid balance of said note for $28,950.

On December 11, A. D. 1931, the coal company made and delivered its demand note, bearing said date, for the sum of $20,000, payable to the order of the said Hutchinson and C. H. Jenkins, which note they indorsed and delivered to the said bank, and on which note it loaned to the coal company the sum of $20,000. At the time said note was made and negotiated, the said Hutchinson and the said C. H. Jenkins were accommodation indorsers of said note, and loaned their credit to said coal company in order that it might procure from said bank the loan represented by said note.

VII. That the Hutchinson Coal Company, from the years 1927 to 1932, both inclusive, in common with other coal companies, engaged in mining coal in West Virginia, carried on its mining operations at a great loss, necessarily incurring in so doing a heavy indebtedness. It attempted to finance its operations by the sale of its first and refunding mortgage bonds, which were provided and in its treasury for the purpose, but such bonds were wholly unsalable at any price to the public. To the end that said coal company might carry on its mining enterprises and to prevent a forced liquidation and sacrifice of

the assets of the company, the plaintiff Hutchinson made the sacrifice outlined in the preceding paragraph, and, in addition thereto, on March 29, A. D. 1932, purchased from the coal company its first and refunding mortgage bonds of the aggregate par value of $481,000, at 85 per centum of par, the transaction being finally closed as of April 1, A. D. 1932. The purchase price of said bonds, aggregating the sum of $408,850, was paid in the following manner: In the discharge and satisfaction of notes and obligations of the coal company held by the said M. L. Hutchinson for moneys advanced and loaned by him of the aggregate amount of $109,586.09, the payment by the said Hutchinson to said coal company in cash of the sum of $413.91, and the assumption and payment of outstanding obligations of the coal company in discharge of the liability of the coal company thereon, of the aggregate amount of $298,850, held by the following creditors of the said coal company, to wit:

Bankers Trust Company of New York..... $100,000.00
National City Bank, New York............ 30,000.00
Corn Exchange Bank, Philadelphia........ 75,000.00
The Empire National Bank of Clarksburg 20,000.00
The National Bank of Fairmont.......... 28,950.00
The National Bank of Fairmont.......... 20,000.00
The Lowndes Savings Bank & Trust Company ................................... 24,900.00

The above-described obligations were either renewed after April 1, A. D. 1932, in the name of the Hutchinson Coal Company, or were paid off by the plaintiff Melville L. Hutchinson. About March 29, A. D. 1932, James H. Thomas, president of the National Bank of Fairmont, and John W. Meredith, auditor of said bank, the president at his office at the banking room of said bank, and the auditor at the banking room of said bank, were informed either by Melville L. Hutchinson or C. H. Jenkins, now deceased, or by both of them, that Melville L. Hutchinson had entered into an agreement with the Hutchinson Coal Company wherein and whereby he assumed and undertook to pay the notes hereinbefore described as (a) and (b), to the relief, exoneration, and discharge of the Hutchinson Coal Company. No other notice was given to any of the above-mentioned banks, either by the Hutchinson Coal Company or by Melville L. Hutchinson, of the assumption of the above-described obligations.

. A true copy of the minutes of the meeting of the board of directors of the Hutchinson Coal Company, held on March 29, A. D., 1932, is appended to the stipulation of facts, filed in this case.

VIII. Upon the obligations described in the preceding paragraph No. VII, on and after April 1, A. D., 1932, payments were made as follows:

Note Held by Bankers Trust Company of New York, $100,000.

On June 11, A. D., 1932, by delivering the check of the Hutchinson Coal Company, there was paid upon the interest on said note $1,013.90.

On July 5, A. D. 1932, there was paid upon said note by check of the Hutchinson Coal Company, for interest, $250.

On July 13, A. D., 1932, Melville L. Hutchinson paid out of his personal assets upon said note $14,964.38.

On July 19, A. D. 1932, Melville L. Hutchinson paid directly out of his personal assets upon said note, principal and interest, the balance of said note and accrued interest, $85,273.15.

Note Held by National City Bank, $30,000.

Prior to May 3, A. D. 1932, Melville L. Hutchinson paid by his personal checks upon said note an aggregate amount of $2,500.

On May 3, A. D. 1932, there was paid by delivery to the bank the check of the Hutchinson Coal Company for interest upon said note, the sum of $123.85.

On July 15, A. D. 1933, Melville L. Hutchinson paid directly out of his personal assets the balance of said note and interest, amounting to $27,827.73.

Note Held By Corn Exchange National Bank of Philadelphia, $75,000.

On October 18, A. D. 1932, Melville L. Hutchinson paid upon the principal sum of said note out of his personal assets the sum of $25,538.28; and on March 14, A. D. 1934, the said Melville L. Hutchinson paid out of his personal assets upon the principal of said note the sum of $10,293.76.

From April 1, A. D. 1932, to December 31, A. D. 1932, there was paid interest on said note by delivering checks of the Hutchinson Coal Company of the aggregate amount of $3,134.40.

In the calendar year 1933 there was likewise paid upon interest on said note, by delivering checks of the Hutchinson Coal Company, the aggregate sum of $2,500.55.

In the calendar year 1934, prior to the institution of this suit, there was likewise

paid upon the same by delivering checks of the Hutchinson Coal Company the aggregate amount of $2,139.64.

The sum of $39,000, principal amount of said note, remains unpaid.

### Note Held by The Empire National Bank of Clarksburg, $20,000.

Prior to December 31, A. D. 1932, Melville L. Hutchinson paid directly upon the principal of said note the aggregate amount of $10,000. There was paid upon the interest account of said note, by delivering the checks of the Hutchinson Coal Company, between April 1, A. D. 1932, and December 31, A. D. 1932, the total of $624.99.

In the calendar year 1933, there was likewise paid upon the same, by delivering checks of the Hutchinson Coal Company, a total of $600.

In the calendar year 1934, and prior to the institution of this suit, there was likewise paid upon the same by delivering the checks of the Hutchinson Coal Company a total of $600.

The principal sum of $10,000 of said note remains unpaid.

### Note Held by The Lowndes Savings Bank & Trust Company, $24,900. Later Taken Over by The First National Bank in Fairmont.

On September 6, A. D., 1932, Melville L. Hutchinson paid upon said note out of his personal assets the sum of $900.

Between April 1, A. D. 1932, and December 31, A. D. 1932, there was paid interest upon said note, by delivering the checks of the Hutchinson Coal Company, aggregating $1,127.40.

In 1933 Melville L. Hutchinson made payments directly out of his personal assets upon the principal amount of said note aggregating $2,200.

In the calendar year 1933 there was paid on the interest account of said note, by delivering checks of the Hutchinson Coal Company, a total of $1,456.92.

In the calendar year 1934, prior to the institution of this suit, there was paid on same, by delivering checks of the Hutchinson Coal Company, a total of $1,189.50.

In 1934, and prior to the institution of this suit, the said Melville L. Hutchinson paid upon the principal amount of said note out of his personal assets a total of $10,134.62.

### Note Held by The National Bank of Fairmont, $28,150.

On July 27, A. D. 1932, Melville L. Hutchinson paid by his personal check on the principal of said note $950.

On October 25, A. D. 1932, he paid in the same manner the sum of $1,000; and on January 20, A. D. 1933, he paid in the same manner the sum of $2,000.

There was paid upon the interest account on said note from April 1, 1932, to December 31, 1932, by delivering checks of the Hutchinson Coal Company, a total of $1,341.27.

On January 23, A. D. 1933, there was likewise paid on same by checks of the Hutchinson Coal Company $375.

### Note Held By National Bank of Fairmont, $20,000.

On November 21, A. D. 1932, there was paid on interest account of said note, by delivering the check of the Hutchinson Coal Company, the sum of $600.

Melville L. Hutchinson has at all times since April 1, A. D. 1932, owned, and still owns, the first mortgage bonds of the Hutchinson Coal Company acquired by him on April 1, A. D. 1932, of the par value of $481,000. The said bonds bear interest at the rate of 6 per centum per annum, payable on January 1st and July 1st of each year. The overdue interest coupons on said bonds bear interest at the same rate of 6 per centum from maturity date of the same.

All of the checks of the Hutchinson Coal Company, used and applied in the payment of interest on each of the notes above listed, were, by the Hutchinson Coal Company, charged on its books to Melville L. Hutchinson as credits upon the interest accruing on the bonds of the Hutchinson Coal Company of the par amount of $481,000. The total amount of the interest accruing on said bonds from April 1, A. D. 1932, to January 1, A. D. 1933, was $21,645.

The total amount of all of the checks of the Hutchinson Coal Company used in making payment of interest on all of the notes above listed, from April 1, A. D. 1932, to January 31, A. D. 1933, was $8,215.81. So that a balance taken on January 1, A. D. 1933, leaves the Hutchinson Coal Company debtor on said account to Melville L. Hutchinson in the amount of $13,329.19.

The interest accrued on said bonds from January 1, A. D. 1933, to January 1, A. D. 1934, is $28,860, which, plus the balance due January 1, A. D. 1933, makes a total of $42,189.19.

The total of the checks of the Hutchinson Coal Company used and applied in making payments upon interest on the obligations above listed, for the calendar year 1933, was $4,932.47, which, deducted from the interest due Melville L. Hutchinson to said date, leaves the Hutchinson Coal Company debtor to Melville L. Hutchinson on the interest account $37,256.72.

The interest accrued on said bonds from January 1, A. D. 1934, to January 1, A. D. 1935, is $28,860, which, added to the amount due January 1, A. D. 1934, amounts to $66,116.72.

The total of the checks of the Hutchinson Coal Company, used and applied on the payment of interest on the above-listed obligations, and charged to the account of Melville L. Hutchinson, in the calendar year 1934, was $3,929.14.

On January 1, A. D. 1935, the Hutchinson Coal Company was indebted unto Melville L. Hutchinson on the interest account in the amount of $62,187.58. The above computation does not include interest on overdue interest coupons which will increase considerably the indebtedness of the Hutchinson Coal Company on said account.

IX. That, at the time of the appointment of the conservator of said bank, and at the time and upon the appointment of the receiver of said bank, the said Hutchinson requested the said conservator, and, upon his appointment, requested the said receiver, to charge said two notes of the aggregate principal amount of $45,000, and described herein as notes (a) and (b), to the account of the said Hutchinson, and to cancel and discharge said notes and to deliver the same to the plaintiffs, and to deliver to the said Hutchinson the United States Treasury bonds of the aggregate par value of $30,000, loaned by him to the coal company, and by the coal company pledged with said bank to secure the payment of note (a). But the said conservator, during his conservatorship, and said receiver, since his appointment and qualification, refused, and still refuse, to comply with said request; and refused, and still refuse, to apply said notes as offsets against the liability of the bank to the said Hutchinson, and to charge the same to the said Hutchinson, and to cancel and deliver the same as paid unto the plaintiffs; and refused, and still refuse, to deliver unto the said Hutchinson the bonds so loaned by him to the coal company and pledged by the coal company with said bank.

X. That the receiver still holds the notes of the coal company described as (a) and (b), and will not discharge the coal company from the payment thereof by offsetting the same against the liability of the bank to the said Hutchinson; unless and until his right so to do shall have been adjudicated and determined by a court of competent jurisdiction; and, unless he shall be directed to offset said obligations or notes against the liability of the bank to the said Hutchinson by a court of competent jurisdiction, he will proceed to compel the Hutchinson Coal Company to pay the amount of said notes unto him as receiver of said bank.

XI. That James H. Thomas, conservator, during the conservatorship, collected interest upon the United States Treasury bonds hereinbefore described to the amount of $506.22, and retained the amount so collected, which amount was turned over to the receiver by the conservator, and is now held by the receiver, upon the theory that the note of the coal company, to secure the payment of which said bonds were pledged, was still the valid obligation of the coal company and had not been paid and discharged by offsetting the same upon the liability of the bank to Hutchinson.

XII. That all of the interest coupons which became payable on the $30,000 par United States Treasury bonds, pledged to secure the payment of the note for $28,950, were, as they severally matured, detached by or for Melville L. Hutchinson, collected by the National Bank of Fairmont, and deposited to the credit of Melville L. Hutchinson in his personal account in said bank.

XIII. That Melville L. Hutchinson was a stockholder, director, one of five members of the finance committee, and vice president of the National Bank of Fairmont at the time the obligations or loans described as (a) and (b) were made, and remained such stockholder, director, member of finance committee, and vice president continuously until the bank closed; that the capital stock of said bank throughout the year 1932, and up to the time it closed, was $400,000. The surplus was $600,000 on March 29, A. D. 1932. On or about April 11, 1932, the surplus was

reduced to $400,000, and on the same date the undivided profits were increased to $200,000.

That, on March 29, 1932, Melville L. Hutchinson owed the National Bank of Fairmont, as indorser and comaker, in addition to the notes in controversy, the sum of $21,994.90, and on the date of the suspension of payment of such bank owed it as indorser and comaker, including note (b) in controversy, the sum of $43,804.90, which amount is made up as follows:

| | |
|---|---|
| Note of Duncan Sinclair | $ 4,000.00 |
| Note of Christ Episcopal church | 17,160.00 |
| Note (b) Hutchinson Coal Company, in controversy | 20,000.00 |
| Note of S. B. Miller | 1,250.00 |
| Note of Albert Alexander | 128.00 |
| Note of Carl J. Carter | 700.00 |
| Note of Robert S. Lambert | 75.00 |
| Note of R. T. Cunningham | 241.90 |
| Note of Ora G. Cowson | 250.00 |

All of the above-described notes, except the note for $20,000 and the note of Albert Alexander for $128, have, since the suspension of business of said bank, been paid off by the parties principally liable on said notes, or extinguished by offsetting the same against the accounts of the principal makers.

Meetings of the board of directors of the National Bank of Fairmont were held on March 1, 8, 15, 22, and 31, and April 5, 12, 19, 20, and 26, of the year 1932, all of which were attended by Melville L. Hutchinson, except the meetings held on April 5, 1932. The assumption of indebtedness described as (a) and (b) by Melville L. Hutchinson for and in behalf of Hutchinson Coal Company was never discussed by the board of directors at any of its meetings and no action was ever taken thereon. The minutes of the meetings of such board of directors, both before and after the 29th day of March, A. D. 1932, are silent as to the assumption of such indebtedness described as notes (a) and (b) by Melville L. Hutchinson. The minutes do show the granting or transfer of other loans during the same period of time.

That the members of the finance committee of said bank, on March 29, 1932, were as follows: James H. Thomas, Melville L. Hutchinson, W. W. Conaway, Brooks Fleming, Jr., and J. Ray Smoot. The finance committee held meetings on March 9, 10, 21, 23, and 28, and April 1, 4, 8, 9, 15, 22, and 23 of the year 1932, and held other meetings both before and after the dates mentioned. Minutes were kept of each meeting showing loans and other financial transactions authorized at such meetings. No reference is made in the minutes of any meeting of the finance committee to loans (a) and (b) or to the assumption thereof by Melville L. Hutchinson.

That the only reference made to either of the notes (a) and (b) in controversy, in any of the minutes of the meetings of the finance committee, or the board of directors, is that contained in the minutes of the board of directors held November 3, A. D. 1931, which is as follows: "Notes as entered on the discount ledger 3 to 225, inclusive, were read and reviewed by the board." Note (a) in controversy herein was numbered 223 on the discount ledger.

No other authorization for the original obligations represented by notes (a) and (b) appears anywhere in the bank's records.

That note (b) was never renewed and remained in the same form in which it was originally made up to the closing of the bank. Note (a) was renewed after March 29, A. D. 1932, on April 28, A. D. 1932, and July 27, A. D. 1932, October 25, A. D. 1932, and January 23, A. D. 1933. Each time it was renewed, the form of the note was not changed, being signed by "Hutchinson Coal Company by M. L. Hutchinson, President," made payable to the order of said the National Bank of Fairmont, the name of Melville L. Hutchinson not appearing anywhere on any renewal of such note, except as president of the coal company. C. H. Jenkins was the vice president of said Hutchinson Coal Company.

That proof of claim was made by said Melville L. Hutchinson for $19,700.66, and a conservator's certificate of proof of claim was issued therefor by James H. Thomas, conservator. A dividend of 25 per cent. on this item of $19,700.66, amounting to $4,925.16, was paid and accepted by Melville L. Hutchinson on November 9, A. D. 1933.

No release by the National Bank of Fairmont of any description whatsoever has ever been authorized, executed, or delivered to the Hutchinson Coal Company as to its liability on the notes in question, and such bank has never agreed to look to Melville L. Hutchinson for the payment thereof. The records at the bank continue to show these notes in their original

form, and no notation or memorandum was ever made on any of the bank's records to show any change in the liability on these notes, or the assumption of either of them by Melville L. Hutchinson.

That, on the 19th day of October, A. D. 1933, in order to create a liquidating account of $756,673.08 to pay a 25 per cent. dividend upon known net unsecured common liabilities, and to pay secured deposits of $972,810.93 of said bank, James H. Thomas, conservator as aforesaid, entered into a written agreement with the First National Bank in Fairmont, of which Melville L. Hutchinson was president. Among the assets listed as class A assets in the schedule attached to this written agreement of sale appeared the following:

are appended to the stipulation of facts, filed in this case.

The committee of the First National Bank in Fairmont that selected the assets of the National Bank of Fairmont, described in the skeleton form of contract as class A assets, was composed of A. S. Fleming, Ward Lanham, Frank A. Davis, and C. H. Tarleton. The schedule of class A assets attached to the skeleton form of contract is many pages long and most of the matters contained therein are immaterial in this cause, and, for that reason, the schedule is omitted from the stipulation of facts. A number of copies of the skeleton form of contract with a schedule of class A assets attached thereto were made up and each was executed by

| Note Number | Description | Original Amount | Date | Credits | Amount |
|---|---|---|---|---|---|
| 15349 | Hutchinson Coal Co. Dated 1-23-33, Due 4-23-33, 6 M $30,000 par value U. S. Treasury Bonds, 3⅜% | $25,000.00 | 6-16-33 | Credit | $506.22 |

| Principal | Interest | Total |
|---|---|---|
| $24,493.78 | $784.27 | $25,278.05 |

This written agreement is dated October 19, A. D. 1933, and is signed by "James H. Thomas, Conservator of The National Bank of Fairmont, (W. Va.)," and "First National Bank in Fairmont (W. Va.) by M. L. Hutchinson, President," and "Attest: W. S. Clark, Cashier." An order was entered in the District Court of the United States for the Northern District of West Virginia on October 3, A. D. 1933, approving the aforesaid agreement, and authorizing James H. Thomas, conservator as aforesaid, to transfer and deliver the assets described therein, under the terms of such contract. The note described in such agreement as "Note 15349 Hutchinson Coal Company," is the same note in controversy in this case, described herein under item (a); and this note, together with others, listed in Schedule A of the agreement, was turned over to the First National Bank in Fairmont and accepted by it under the terms of said agreement, and delivered back to defendant herein on February 11, A. D. 1935, and is now in the defendant's possession.

Said agreement entitled "Skeleton Form of Contract," and a copy of the order of the District Court of the United States for the Northern District of West Virginia,

the conservator of the National Bank of Fairmont and by the First National Bank in Fairmont. Shortly after the execution of the skeleton form of contract aforesaid and the schedule of class A assets attached thereto, Mr. Melville L. Hutchinson was requested by the First National Bank in Fairmont to renew the asset described as item (a) herein, but Mr. Hutchinson, who had previously asserted a right to offset this particular asset against his checking account in the National Bank of Fairmont, refused to renew said obligation or to pay the same to the National Bank in Fairmont. Said asset (a) was not for that reason set up on the books of the National Bank in Fairmont.

Considerable correspondence then ensued between R. C. Miller, receiver, and the office of the Comptroller of the Currency. Pertinent paragraphs from this correspondence are as follows:

In a letter from R. C. Miller, receiver, to the Comptroller of the Currency, dated October 27, A. D. 1934, the following paragraph appears: "On Assets Nos. 1263 and 1264, there has been considerable controversy and correspondence with regard to an offset claimed by Mr. M. L. Hutchinson under his contention that he has as-

sumed, personally, the payment of these notes and had an agreement with the Hutchinson Coal Company that he would be allowed to use the Coal Company's name in renewals. The First National Bank's position in this matter is that if they were to pay for these notes, without recourse, by giving proper credit in the Liquidating Account, Mr. Hutchinson could sue them in a state court for the offset he claims; that the First National Bank would not have the right to plead for the removal of the case to the Federal court, and that if Mr. Hutchinson's claim were allowed, the bank would be subject to a loss of more than $25,000.00 without having recourse against this Receivership. At the time of the transfer of assets from The National Bank of Fairmont to the First National Bank in Fairmont, all of these notes were past due and the officers of the First National Bank in Fairmont maintained that the purchase of such past due paper, under West Virginia law, must be subject to all rights of offset of every nature."

In a letter to R. C. Miller, receiver, from H. J. Hall, assistant supervising receiver, Division of Insolvent National Banks, dated November 16, 1934, the following paragraph appears: "Considerable correspondence has been had with you concerning the Hutchinson Coal Company notes, but no reference was made in that correspondence to the fact that the notes of this company had been included in the sale to the new bank. Furthermore, your letters concerning the request of Mr. Hutchinson to set off his individual claim against the coal company's notes did not refer to or describe Asset No. 1263, but only made mention of Assets Nos. 1261 and 1264 in the principal amounts of $20,000 and $24,493.78 respectively. We are replying by separate letter to your communication of October 20, concerning the Hutchinson Coal Company notes."

In a letter to Mr. R. C. Miller, receiver, from Fred Buerstetta, assistant supervising receiver, Division of Insolvent National Banks, dated November 16, 1934, the following paragraphs appear:

"Reference is made to your letter dated October 20 and previous correspondence concerning a request made by Mr. M. L. Hutchinson to set off two notes, aggregating the principal sum of $44,493.78, executed by the Hutchinson Coal Company, being Assets Nos. 1261 and 1264, against a like portion of a deposit account carried under the name of and owned by Mr. Hutchinson. In your letter dated October 27 concerning Class A Assets included in the Spokane sale agreement with the First National Bank in Fairmont, you state that Asset No. 1264 was included in the schedule of Class A assets, but credit therefor was not given to your trust because the maker refused to execute a renewal to the new bank. In the last mentioned letter you also refer to Asset No. 1263, being a note of the Hutchinson Coal Company in the principal amount of $975.00, but this asset was not mentioned in any of your previous letters relating to Mr. Hutchinson's request for offset.

"Before we can reply to your letter of October 20 it will be necessary for you to furnish the information requested in another letter which is being addressed to you today in reply to your communication of October 27. We also desire to have you make separate reply to this letter advising fully as to the status of Asset No. 1263, and you should state clearly whether or not this item has been included by Mr. Hutchinson in his request for set off. The circumstances under which this note was executed and the basis upon which any request by Mr. Hutchinson to set off this note against a like portion of his deposit account should be clearly set forth in your reply to this letter. It is, of course, desired that you reply separately to this communication which is being addressed to you today in order that the two files will not become confused."

In a letter to the Comptroller of the Currency, from R. C. Miller, receiver, dated December 10, 1934, the following paragraph appears: "Asset No. 1264 in the amount of $24,493.78 is one of the notes which Mr. M. L. Hutchinson alleges he agreed to pay personally and on which he has made claim for offset against his personal checking account."

In a letter to R. C. Miller, receiver, from H. J. Hall, assistant supervising receiver, Division of Insolvent National Banks, dated December 29, 1934, the following paragraph appears: "In the case of assets Nos. 1264 and 1700 you may inform the new bank that you will accept the return thereof, with the distinct understanding that such action will not be construed by them as establishing a precedent. Please advise us when this matter has been successfully settled."

In a letter to W. S. Clark, cashier, First National Bank in Fairmont, Fairmont, W. Va., from R. C. Miller, receiver, dated January 18, 1935, the following paragraph appears: "Referring to conversations we have had regarding certain notes receivable of The National Bank of Fairmont which were included in the Spokane Sale of Assets to your bank, and to your request that I obtain authority from the Comptroller of the Currency to take these items back into this trust, please be advised that I have authority from the Comptroller of the Currency to take back the note of the Hutchinson Coal Company in the approximate amount of $25,000.00 and note of Peter McLinden which shows an unpaid balance of $15.00."

Pursuant to this correspondence, note No. 15349, Hutchinson Coal Company, described herein under item (a), was delivered back to the defendant herein on February 11, A. D. 1935, and is now in his possession.

Copies of obligations (a) and (b) are appended to the stipulation of facts.

■ There being no stipulation or showing in this case that Hutchinson Coal Company was insolvent, in the consideration of the questions involved, it is considered as solvent.

### Conclusions of Law.

If it be conceded that, upon the agreement of M. L. Hutchinson to assume and pay the debts of the Hutchinson Coal Company, a corporation, as evidenced by the minutes of the directors of said corporation at their meeting on March 29, 1932, the said M. L. Hutchinson then became the principal, and the said Hutchinson Coal Company the involuntary surety as between themselves; this new relationship which came into being is not binding upon the bank, or its receiver.

■ In Petty v. Warren, 90 W.Va. 397, 110 S.E. 826, the principle is recognized as well established that, where one person agrees with another to be primarily liable for a debt owing by that other to a third person, as between the parties to the agreement, the first is the principal and the second becomes the surety. This question is fully discussed in Keller v. Ashford, 133 U.S. 610, 10 S.Ct. 494, 33 L.Ed. 667.

If the receiver of said insolvent bank were suing M. L. Hutchinson on said notes by virtue of said assumption agreement and the said Hutchinson sought to have the aggregate amount of said notes offset against his individual deposit in said bank at the time of its closing, a much different case would be presented. If the suit were in this form, there would then be presented, first, the question of the right of the receiver of a creditor bank proceeding against one who has promised to assume and pay the debt of the original debtor to said creditor bank; second, the question of the proper proceeding; and, third, the question of the right of the assuming party to offset an individual deposit against the debt assumed. Since counsel for Hutchinson seem to approach the question on such hypothesis, let us first briefly analyze the case if in such a factual situation.

■ In Central Electric Company v. Sprague Electric Company (C.C.A.) 120 F. 925, it is laid down that: "Whether the remedy to enforce a contract for the payment of the obligations of a third person in the federal courts is by suit in equity or by action at law is dependent on the law of the forum."

Willard v. Wood, 135 U.S. 309, 10 S.Ct. 831, 34 L.Ed. 210, and Johns v. Wilson, 180 U.S. 440, 447, 21 S.Ct. 445, 45 L.Ed. 613, and other federal authorities hold to the same effect.

■ The West Virginia Code (Michie's 1932 Annotated Code, chap. 55, art. 8, § 12, ser. sec. 5494 [Code 1931, 55-8-12]) provides as follows: "If a covenant or promise be made for the sole benefit of a person with whom it is not made, or with whom it is made jointly with others, such person may maintain, in his own name, any action thereon which he might maintain in case it had been made with him only, and the consideration had moved from him to the party making such covenant or promise."

The decisions of the Supreme Court of Appeals of West Virginia construing this section hold that it does not authorize one not a party to a contract made for his benefit to sue thereon in a court of law unless such contract was made for his sole benefit. Johnson v. McClung, 26 W.Va. 659; King v. Scott, 76 W.Va. 58, 59, 84 S.E. 954; Hamilton v. Wheeling Public Service Company, 88 W.Va. 573, 107 S.E. 401, 21 A.L.R. 433; Petty v. Warren, 90 W.Va. 397, 110 S.E. 826.

■ Was the bank then the sole beneficiary of the contract between M. L. Hutchinson and the coal company, whereby, among other things, Hutchinson agreed to assume and pay the two notes owing by the coal

company to the bank? The case of Petty v. Warren, 90 W.Va. 397, 110 S.E. 826, involved a promise of a purchaser of personal property to pay the debt which the seller owed for such property to a third party. It was therein held that such undertaking was certainly as much for the benefit of the seller as it was for the third party's benefit, and consequently, not being for the sole benefit of the third party, an action at law by the third party against the one who assumed the debt would not lie. These principles are laid down in the syllabus as follows:

"One not a party to a contract nor in privity with either of the parties thereto may not maintain a suit at law, unless the promise or undertaking relied upon is made for his sole benefit.

"A promise made by a purchaser of personal property to pay a debt which the seller owes for such property to a third party is not for the sole benefit of such third party."

It would therefore seem clear that the bank was not the sole beneficiary of the contract between Hutchinson and the coal company, and that an action at law by the receiver of the bank against Hutchinson would not lie.

■ Would the bank, had it assented to said undertaking between Hutchinson and the coal company, have any remedy thereon against Hutchinson? This question is answered by the case above cited of Petty v. Warren, 90 W.Va. 397, 110 S.E. 826, wherein it is held that: "Where one agrees with another to become primarily liable for a debt due from that other to a third person so that as between the parties to the agreement the first becomes the principal and the second the surety, the creditor may in equity, upon the doctrine of subrogation, maintain a suit to recover the amount of such debt from the person so assuming to pay the same."

This is the theory uniformly followed by the federal courts. Keller v. Ashford, 133 U.S. 610, 10 S'.Ct. 494, 33 L.Ed. 677; Willard v. Wood, 135 U.S. 309, 10 S.Ct. 831, 34 L.Ed. 210; Second National Bank v. Grand Lodge, 98 U.S. 123, 25 L.Ed. 75; Goodyear Shoe Machinery Co. v. Dancel, 119 F. 692, 56 C.C.A. 300.

The West Virginia Code (Michie's 1932 Annotated Code, c. 56, art. 5, § 4, ser. sec. 5629 [Code 1931, 56-5-4]) provides in part as follows: "In a suit for any debt, the defendant may at the trial prove and have allowed against such debt any payment or set-off which is so described in his plea, or in an account filed therewith, as to give the plaintiff notice of its nature, but not otherwise. Although the claim of the plaintiff be jointly against several persons, and the set-off be of a debt, not to all, but only to a part of them, this section shall extend to such set-off, if it appear that the persons against whom such claim is, stand in the relation of principal and surety, and that the person entitled to the set-off is the principal."

In a very thorough article in 28 West Virginia Law Quarterly 141 (summary of the decisions construing said section), it is stated that in West Virginia the essentials of a valid set-off are: (1) The plaintiff's demand must be in the nature of a debt; (2) the demand proposed to be set off must also be in the nature of a debt, and not a claim for liquidated damages, but it may be either legal or equitable; (3) the demands must be due between the same parties; (4) the debts must be due in the same right; and (5) the debt to be set off must be due and payable.

■ It is a broad general principle of practically universal application that to warrant a set-off the demands must be mutual and subsisting between the same parties. Beuke v. Boggs Run Min., etc., Co., 100 W.Va. 141, 130 S.E. 132; Little Kanawha Navigation Company v. Rice, 9 W.Va. 636; Pulliam v. Winston, 5 Leigh (Va.) 324; James v. Johnston, 22 Grat. (Va.) 461.

If the bank (assuming that it assented to Hutchinson's undertaking to pay the bank's debt to it, but not conceding that the bank did in fact so assent), had sued Hutchinson in equity on his said promise, it would be availing itself, under the doctrine of Petty v. Warren, 90 W.Va. 397, 110 S.E. 826, of the coal company's right as surety in the new relation thereby created to Hutchinson against him as the assuming party. There would, therefore, seem lacking an essential element of a valid set-off; namely, mutuality in quality of right.

It was obviously the intention of the coal company and Hutchinson, as evidenced by the minutes of the directors of the coal company at their meeting on March 29, 1932, that in so far as the bank was concerned, the coal company would continue as the principal or primary debtor, while

Hutchinson would become the surety, or secondary obligor. There being no stipulation that the coal company was insolvent, it must, therefore, be regarded as solvent.

The recent case of Erie Bronze Company v. John R. Haughney, Receiver of Second National Bank of Erie (D.C.) 17 F.Supp. 1022, is very much in point. The facts in the Erie Bronze Company Case are that Edkins borrowed a sum of money from the bank and gave his note. Payments were made to the bank on the Edkins note by the bronze company, the company charging such payments against Edkins on the books of the company. Thereafter an agreement was entered into between the bronze company, and Edkins and Piper, whereby Edkins was employed to manage the affairs of the company and the company agreed to assume the Edkins note to the bank. It did appear that the matter of the assumption was discussed with a clerk of the bank who advised that the bank would have no objection to the bronze company becoming maker if it could legally be done. The notes had, at that time, been pledged with the R. F. C. as collateral on a loan. The bronze company never, as a matter of fact, assumed the Edkins note nor did the bank accept a new obligation. When the bank closed, the note still remained in the name of Edkins as the maker alone.

At the time of the closing of the bank, the bank was indebted to the bronze company on a deposit liability of over $13,000, and Edkins was indebted to the bank for about $40,000 on the above-mentioned note. The bank sought to have its deposit set off as a credit on the Edkins note. Judge Schoonmaker says: "Our conclusion is that these two accounts were not owed in the same right, because the bank had no claim whatever against the Erie Bronze Company on these notes and could not have maintained an action thereon. The fact that the company had agreed with Edkins and Piper to pay these notes would not change the situation."

The court therefore held that the debt owed by the bank to the Erie Bronze Company on the deposit account, and the debt owed by B. C. Edkins to the bank, are not debts owed in the same right; and there can be no set-off in this case.

In the instant case, the deposit liability of the bank to Hutchinson, and the coal company's liability to the bank on the notes, were not owed in the same right.

This is one of the essentials of a valid set-off mentioned in 28 West Virginia Law Quarterly 141. The fact that Hutchinson had agreed with the coal company to pay said notes would not change the situation. So far as the bank is concerned, Hutchinson never, in fact, assumed the coal company's notes, nor did the bank accept new obligations. When the bank closed, the notes remained the principal obligations of the coal company.

In 24 R.C.L. § 65, p. 861, the following is laid down: "The right of equitable off-set does not exist in favor of a surety as to his individual claim, where the creditor is insolvent, but the principal solvent, nor where the primary obligor, although insolvent, has indemnified the surety secondarily liable, nor where the surety has been satisfied. So a surety on a note payable to a bank cannot, upon the bank's becoming insolvent, set-off his deposit account upon the note, if the principal remains solvent and no proceedings have been taken against the surety. But if the real debtor is unable to pay, and the creditor is compelled to resort to the surety or indorser, who is eventually to be the loser, he has the equitable right to off-set demands against the creditor. This condition creates an equity, for it is unconceivable that the plaintiff should insist that the defendant pay him, and then leave the defendant powerless because of the plaintiff's insolvency to enforce his claim against the plaintiff."

In 21 R.C.L. § 119, p. 1078, the same general principle is stated as follows: "It has, however, been held that a surety on a note payable to a bank cannot, on the bank's becoming insolvent, set-off his deposit account against the note, if the principal remains solvent and no proceedings have been taken against the surety."

In United States Fidelity, etc., Co. v. Wooldridge, 268 U.S. 234, 45 S.Ct. 489, 69 L.Ed. 932, 40 A.L.R. 1094, affirming (C.C.A.) 295 F. 847, a guaranty company sued by a receiver on a bond given to indemnify the bank against the default of its president, which had previously, as surety on a bond given by the bank to guarantee the deposit of a railroad, paid the railroad the amount of its claim and became subrogated to the railroad's rights against the bank. It was held not entitled to set off such claim against its liability on bond. Although it is true that in this case the surety company acquired its claim by way of subrogation after the closing of the

bank, yet Mr. Justice Holmes, in delivering the opinion of the court, pointed out that, even though the rights of the surety company as subrogee had accrued or been perfected prior to suspension of the bank, the result would be the same.

In 24 R.C.L. § 13, pp. 804, 805, the following principles are laid down: "The general rule is that the remedy of equitable set-off may be enforced independent of the statutes governing set-off, where from the nature of the claim or from the situation of the parties it is impossible to obtain justice by plea or cross action; in other words, in these cases where, through no fault of the defendant, he has no remedy at law. But there will be a grant of the remedy only for the purpose of securing an equitable result, and not where its allowance would work an injustice to others having equal equities. * * * Accordingly, the mere existence of cross demands is not a sufficient ground for interference; the party seeking the benefit of the set-off must show some peculiar equity which entitles him to be protected against his adversary's demand."

In 57 C.J. § 7, p. 363, we find the same general principle stated in the following words: "Generally speaking, an equitable set-off will be allowed when the party seeking it shows some equitable ground therefor and it is necessary in order to promote justice, avoid or prevent irremediable injustice, or give effect to a clear equity of the party seeking it. Conversely, some ground for equitable interposition must be alleged and shown and the set-off will not be allowed where it would be inequitable or work injustice or where it is not necessary to prevent irremediable injustice."

In Clark Bros. & Co. v. Pou (C.C.A.) 20 F.(2d) 74, a case from the Fourth Circuit, decided in 1927, the following rule appears in the syllabus: "Set-off will be allowed only to secure an equitable result, and not where its allowance will work an injustice to others having equal equities."

In a recent case from the Fourth Circuit, Shannon v. Sutherland (C.C.A.) 74 F.(2d) 530, 531, 97 A.L.R. 583 (decided in 1935), Judge Parker in a very excellent opinion summarizes the general principles governing cases involving the question of equitable set-off, from which opinion we quote as follows:

"The right of a depositor in an insolvent bank to set off his deposit against his liability on an instrument upon which he is in fact primarily liable, or is ultimately bound to pay, although not primarily liable, is well recognized. Thus, in the case of accommodation paper, such right of set-off may be asserted by the person accommodated, who is in reality the person bound to pay the debt, even though the accommodation maker may appear upon the face of the instrument as the one primarily liable. Scott v. Armstrong, 146 U.S. 499, 13 S.Ct. 148, 36 L.Ed. 1059; Building & Engineering Co. v. Northern Bank of N. Y., 206 N.Y. 400, 99 N.E. 1044, 1045; Williams v. Rose (D.C.) 218 F. 898. And it may be asserted by an indorser, who is not primarily liable upon the instrument, if the maker is insolvent and the indorser is the one upon whom the burden of payment will ultimately fall. Bryant v. Williams (D.C.) 16 F.(2d) 159, 162; Yardley v. Clothier (C.C.) 49 F. 337, affirmed (C.C. A.3d) 51 F. 506, 17 L.R.A. 462; Edmondson v. Thomasson, 112 Va. 326, 71 S.E. 536, Ann.Cas.1913A, 1301, and note; In the Matter of Receiver of Middle District Bank, 1 Paige (N.Y.) 585, 19 Am.Dec. 452; Ex parte Rice, 161 S.C. 77, 159 S.E. 492, 79 A.L.R. 123; 7 C.J. 747; and see notes, 25 A.L.R. 950 et seq.; 82 A.L.R. 670 et seq., and 50 L.R.A.(N.S.) 167 et seq. On the other hand, the indorser who is only secondarily liable has no right of set-off where he has been indemnified or where the maker is solvent. Bryant v. Williams, supra; Bank of United States v. Braverman, 259 N.Y. 65, 181 N.E. 50, 82 A.L.R. 658. And the accommodation maker, who is the person primarily liable on the face of the instrument, is denied set-off, where the accommodated indorser is solvent. Knaffle v. Knoxville Banking & Trust Co., 128 Tenn. 181, 159 S.W. 838, 50 L.R.A.(N.S.) 167. The reason at the basis of these decisions is that the one who is the real debtor of an insolvent bank, or the one upon whom the burden of payment will ultimately fall, should be allowed in equity to set off against his obligation the amount due him by the bank, as only the difference is the amount really due; but that, where the amount of the obligation can be collected from another, set-off should not be allowed, as the effect in such case would be to set off the amount due one person against the real debt of another, and thus to enable the depositor to secure preferential payment of his deposit by collecting the amount of the obligation set off against it from the person

primarily liable. See Bank of United States v. Braverman, supra, and cases there cited."

■ Applying these principles to the instant case, it is submitted that M. L. Hutchinson does not have any equitable right to have said two notes of the coal company which he agreed to assume offset against his individual deposit in said bank. The coal company is not insolvent, but amply solvent. Hutchinson agreed with the coal company to pay said two notes to the bank. He was fully paid, secured, or indemnified for this undertaking by receiving from the coal company first mortgage refunding bonds, equivalent at face value with the amount assumed to be paid to the bank. There is every reason to believe that Hutchinson will continue to receive regular interest on his said bonds or credit therefor from the coal company when payable, as well as the principal at the maturity dates thereof. In the event of default in payment of said bonds, he has his remedy of foreclosure under the mortgage securing the same. For Hutchinson to pay the full amount of said notes in behalf of the coal company to the bank receiver would only in fact be doing what he agreed with the coal company to do. To permit Hutchinson to claim such set-off would produce an inequitable result; namely, a preference in his favor over other depositors and creditors of said bank having equal equities. To deny such set-off would result in no injustice to Hutchinson, for he has received bonds of value from the coal company for such undertaking to pay the bank, which bonds, together with interest, he will subsequently collect from the coal company.

■ As stated above, that upon the agreement of M. L. Hutchinson to assume and pay the Hutchinson Coal Company's indebtedness, including the two said notes to the National Bank of Fairmont, as between themselves, Hutchinson became the principal and the coal company became the involuntary surety. This new relationship between Hutchinson and the coal company did not, without more, thereupon become binding on the bank. There must have been either an express or implied assent thereto or acceptance by the bank.

In 6 R.C.L. § 276, p. 889, as to the necessity and effect of acceptance by the beneficiary, it is stated: "It is held by some courts that in order to be able to enforce the contract the beneficiary must accept it. But the general rule seems to be that even though acceptance is to be deemed necessary, the bringing of an action by the third person is sufficient. Where a third person is a beneficiary under a contract, he may maintain an action thereon without notice of acceptance or demand, and the commencement of an action is both acceptance and demand."

In 6 R.C.L. § 277, p. 890, it is said that as to contracts of one to pay the debt of another to a third party it is held in certain jurisdictions that the creditor's rights are not affected until he accepts the promise.

In Thacker v. Hubard & Appleby, 122 Va. 379, 94 S.E. 929, 932, 21 A.L.R. 414, the Virginia Supreme Court of Appeals very clearly discusses the question of assent by the creditor to the assumption by another of an obligation owing by a debtor and in the body of the opinion says: "Of course, no agreement between the mortgagor and his grantee that the latter shall assume the mortgage debt can change the relations of the mortgagor and mortgagee, and require the latter to treat the mortgagor as a mere surety for the debt, without the assent of the mortgagee (Shepherd v. May, 115 U.S. 505, 511, 6 S.Ct. 119, 29 L.Ed. 456, 457), but when the assent of the mortgagee has been given, equity, by a quasi subrogation, and in order to avoid a multiplicity of suits, gives to the mortgagee the benefit of all the collateral obligations for the payment of the debt which the surety (mortgagor) holds for his indemnity. This right of the mortgagee is not the result of any contract between the grantee with the mortgagee, or with the mortgagor for his benefit, nor of any original equity residing in him."

In Bogart v. Porter Co., 193 Cal. 197, 223 P. 959, 31 A.L.R. 1045, it was held that the contract of one to pay the debt of another was, as to the creditor, nothing more than a mere offer or proposal, which could not give rise to an obligation as between the assuming party and the creditor, unless and until accepted by the creditor. It was also held that: "Failure of a creditor whose debt a third person has undertaken to pay, to accept the proposal within a reasonable time, revokes the proposal by operation of law."

■ The question then is: Did the bank accept or assent, so for as its debt was concerned, to the undertaking of Hutchinson to pay the debts of the coal company?

The resolution of the directors of the coal company of the meeting of March 29, 1932, approving the offer of M. L. Hutchinson to purchase the first and re-funding mortgage bonds of the coal company and pay for same by assuming certain debts of the coal company, including the two notes to said bank, further shows that: "The officers of the company were and are authorized to make and renew from time to time for such reasonable length of time as said notes may be outstanding in the name of the Coal Company, the notes of the Coal Company, the payment of which was assumed by M. L. Hutchinson, as set forth in former resolution adopted at this meeting." (See copy of minutes of said meeting filed with the stipulation.)

According to the stipulation of facts, the only notice of the assumption by Hutchinson of the payment of said two notes in behalf of the coal company to the bank was verbal information imparted at the banking room of said bank by M. L. Hutchinson or C. H. Jenkins, now deceased, or by both of them, to James H. Thomas, president of said bank, and John W. Meredith, auditor thereof, respectively. It does not appear that even these officers ever said or did anything with reference thereto which could be construed as an assent to such assumption by said bank through such officers. It is expressly stipulated that the assumption of the indebtedness described as (a) and (b) by M. L. Hutchinson for and in behalf of the coal company was never discussed by the board of directors of the bank at any meeting, and the minutes are silent as to any such matter. It is further stipulated that no reference is made in the minutes of any meeting of the finance committee of said bank to the assumption of said notes by Hutchinson. Particular attention is called to the stipulation wherein it is stated that: "No release by The National Bank of Fairmont of any description whatsoever has ever been authorized, executed or delivered to the Hutchinson Coal Company as to its liability on the notes in question, and such bank has never agreed to look to Melville L. Hutchinson for the payment thereof. The records at the bank continue to show these notes in their original form, and no notation or memorandum was ever made on any of the bank's records to show any change in the liability on these notes, or the assumption of either of them by Melville L. Hutchinson."

Certainly mere notice of such assumption to the president and auditor of the bank would not constitute an assent thereto by the bank. Even if said officers had expressly stated that the bank would release the Hutchinson Coal Company from liability on said notes and look to M. L. Hutchinson alone for the payment thereof, this would not be binding on the bank.

The powers of bank presidents and officers are very fully discussed in exhaustive annotations in 1 A.L.R. 693, and 9 A.L.R. 1146. In First National Bank v. Kimberland, 16 W.Va. 555, 578, it was held that the president of a bank has, as such, no power to make an accord and satisfaction. In First State Bank v. Lang, 55 Mont. 146, 174 P. 597, 600, 9 A.L.R. 1139, it was held that: "Neither the president, the cashier, nor both of them, could release a debtor of the bank from his liability, without authority of the board of directors."

Therefore, in view of the minutes of the meeting of the directors of the coal company and the stipulations as to the conduct of the bank subsequent to said assumption by Hutchinson, it was clearly understood by the coal company and the bank that, so far as the bank was concerned, the coal company was to continue as the principal or primary obligor. Such assumption was consequently only an undertaking as between Hutchinson and the coal company, with no assent thereto, either express or implied, by the bank. Upon the suspension or failure of a national bank, the equitable rights of all depositors and other creditors attach to the assets, subject, of course, to any equities which existed before the bank closed. The right of set-off, either legal or equitable, would not exist in the type of case under consideration before the bank closed and the suspension of the bank would not raise the equity, if any, in favor of Hutchinson to a position superior to that of the other general creditors to the bank. Since neither the bank prior to its insolvency nor the receiver at any time since has assented to such undertaking, the receiver can still look to the coal company as the original obligor on said notes. Therefore, Hutchinson cannot compel the bank receiver to recognize him as the primary obligor and is consequently not entitled to the set-off herein sought by him.

The federal statute prohibits directors of a national bank from making loans to a

single borrower in excess of 10 per cent of the unimpaired capital stock and surplus of the bank, and makes the directors personally liable for damages if they violate it. Code of Laws of the United States, title 12, § 84 (12 U.S.C.A. § 84).

According to the stipulation of facts, M. L. Hutchinson was a stockholder, director, one of five members of the finance committee and vice president of the National Bank of Fairmont at the time the obligations or loans described as (a) and (b) were made and continued in the same connections and capacities with said bank until it was closed. It further appears from the stipulation that from and after April 11, 1932, until March 6, 1933, the bank was closed, its capital stock was $400,000, surplus $400,000, and undivided profits $200,000. It is also stipulated that M. L. Hutchinson was an obligor on loans described as (c) for $16,920 and (d) for $4,000. Had the board of directors of the bank formally approved the assumption between Hutchinson and the coal company, agreed to look to Hutchinson for the payment of the obligations described as (a) and (b), made out new notes and set up the bank records accordingly, then, on the date of closing of the bank, the notes upon which Hutchinson was previously obligated would have aggregated $65,920. While this might not be deemed a violation of the federal statute above mentioned, yet it is quite likely that the bank examiners would have inquired into or questioned the matter in examinations prior to the date of the closing of the bank. To allow Hutchinson the offset herein sought would permit him to take advantage of a matter entirely dehors to any records in the bank. It would also permit him to do indirectly what apparently was studiously avoided being shown done as directly on the books and records of both the coal company and bank.

█ As shown by an exhaustive annotation in 64 A.L.R. 595, it is well settled that one who, by accommodation paper, enables bank officials to conceal the true condition of the bank, will be liable to a receiver of the bank in an action on such paper, on the ground that the maker is estopped under such circumstances from setting up a want of consideration, or an agreement that it was not to be enforced.

Under this doctrine, should the receiver sue the coal company on said notes, the coal company could not defeat its liability by showing Hutchinson's promise to pay the coal company's notes to the bank and an agreement by the bank to release the coal company and look to Hutchinson as the principal or primary obligor.

█ Certainly an officer and director of a bank should not be given an advantage or preference over other general depositors of the bank in allowing a set-off with his individual deposit against indebtedness assumed by him, when such assumption is not a matter of record in the bank. To permit such set-off herein contended for results in a genuine and enforceable obligation of a solvent maker being subject to a secret and hidden agreement to vary the terms of solemn promissory notes.

In German-American Finance Corporation v. Merchants' & Manufacturers' Bank 177 Minn. 529, 225 N.W. 891, 893, 64 A.L.R. 582, the question of public policy in not allowing secret agreements to relieve obligations of the bank from the effect of the express terms thereof is fully discussed, and in the body of the opinion the following pertinent observation is made: "The business of banking is affected with a public interest. The law requires frequent examinations to be made by state officials, and other regulatory methods are adopted to insure proper banking conduct. One of the primary objects is to determine the condition of the bank as to solvency. The notes held by it as assets must be genuine and enforceable obligations of the makers thereof and not subject to hidden and secret agreements that relieve from the contract terms of written instruments. Otherwise the state examinations and published reports, sworn to by the bank officials, will be valueless; the confiding public, lulled into a feeling of security, may be deceived and grossly wronged."

It is the conclusion of the court that the plaintiff M. L. Hutchinson has no right, either legal or equitable, to a set-off of said notes (a) and (b) of the Hutchinson Coal Company, payable to the National Bank of Fairmont, against the individual deposit of the said Hutchinson in said bank at the time of its closing.

Decree may go accordingly.